1
2
3
4
5
6
7
8                      UNITED STATES DISTRICT COURT
9                   SOUTHERN DISTRICT OF CALIFORNIA
10

11   CURTIS CLIFFORD INGRAM,                Case No.:   3:14-cv-02691-GPC-DHB
12                            Plaintiff,     **ORDER:**
13   v.
14   K. STERLING, et al.,                    **(1) ADOPTING IN PART REPORT
                                             AND RECOMMENDATION
15                            Defendants.    REGARDING DEFENDANTS'
                                             MOTION TO DISMISS PORTIONS
16                                           OF PLAINTIFF'S SECOND
17                                           AMENDED COMPLAINT;**

18                                           **(2) GRANTING IN PART AND
19                                           DENYING IN PART DEFENDANTS'
                                             MOTION TO DISMISS PORTIONS
20                                           OF PLAINTIFF'S SECOND
21                                           AMENDED COMPLAINT;**

22                                           **(3) GRANTING PLAINTIFF LEAVE
23                                           TO FILE A THIRD AMENDED
                                             COMPLAINT BY APRIL 21, 2016**
24
25                                           **[ECF Nos. 22, 29.]**
26
27        Plaintiff Curtis Clifford Ingram ("Plaintiff") is a state prisoner proceeding *pro se*
28   and *in forma pauperis* in this civil rights action pursuant to 42 U.S.C. § 1983.  (Dkt. No.

1   1.)[1]  Plaintiff filed a Second Amended Complaint ("SAC") on April 15, 2016, in which

2   he asserts claims against Defendants K. Sterling, K. Balakian, K.A. Seibel, and Warden

3   Paramo (collectively, "Defendants"; individually, "Sterling," "Balakian," "Seibel," and

4   "Paramo").[2]  (Dkt. No. 18-1.)[3]  Pending before the Court is Defendants' Motion to

5   Dismiss Portions of Plaintiff's SAC.  (Dkt. No. 22.)

6          Pursuant to 28 U.S.C. 6336(b)(1)(A), United States Magistrate Judge Louisa S.

7   Porter submitted a Report and Recommendation ("Report") to this Court recommending

8   the Motion to Dismiss be granted in part and denied in part, with leave to amend.  (Dkt.

9   No. 29.)  Judge Porter required the parties to file objections by February 17, 2017.

10  Plaintiff notified the court of his non-opposition to the Report.[4]  (Dkt. No. 30.)

11  Defendants did not file objections.  Having considered the parties' submissions and the

12  applicable law, the Court **ADOPTS IN PART** Judge Porter's Report and **GRANTS IN**

13  **PART** and **DENIES IN PART** Defendants' motion to dismiss.

**FACTUAL BACKGROUND**

15         Plaintiff is currently incarcerated at CSP-Corcoran.  (SAC, Dkt. No. 18-1 at 1.)

16  Plaintiff's SAC concerns incidents occurring in April and October 2014 while Plaintiff

17  was incarcerated at R.J. Donovan Correctional Facility ("RJD") in San Diego, California.

18  (*Id.*)  Plaintiff alleges three separate counts, each of which asserts claims for First

19  Amendment retaliation.  (*Id.* at 3–9.)

20  / / / /

21  / / / /

---

[1] Page numbers for docketed materials cited in this Order refer to those imprinted by the Court's electronic case filing ("ECF") system.

[2] Plaintiff sues all Defendants in their individual and official capacities.  (Dkt. No. 18-1 at 2.)

[3] A corrected version of the SAC, utilized by all parties and the Court in addressing this motion, is docketed as Dkt. No. 18-1.

[4] In his Notice of Non-Opposition to the Report, Plaintiff expressed desire to "expedite this case to its conclusion" by way of "alternative dispute resolution, mediation, arbitration, and/or settlement conference, after adoption of R&R."  (Dkt. No. 30 at 2.)  If the parties wish to pursue alternative dispute resolution, the parties should contact the Magistrate Judge's chambers to discuss further options.

## I.    Count 1

Plaintiff alleges that on April 2, 2014, Sterling, a library technical assistant, denied his attempt to obtain Priority Legal User ("PLU") status, even though Plaintiff had a court order from the Central District of California allegedly demonstrating "extraordinary circumstances" warranting such status.[5]  (*Id.* at 3, 4, 13.)  Sterling told Plaintiff that "PLU is generally for lockdowns and modified program," which Plaintiff alleges is contrary to California Code of Regulations §§ 3122(a), (b)(1), and (b)(6).[6]  (*Id.* at 3–4, 15.)

Sterling's response prompted Plaintiff to file a California Department of Corrections and Rehabilitation ("CDCR") Form 22, which is an informal request for response, on April 2, 2014.  (*Id.* at 3, 15.)  In the CDCR Form 22, Plaintiff stated that he was "erroneously denied PLU statis [sic]" by Sterling "under the unreasonable pretense that PLU statis [sic] is generally for lockdown's [sic] and modified program."  (*Id.*)

---

[5] Plaintiff attached to his SAC a November 21, 2013 Order from the Central District of California, which advised "the Warden and other custodial officials" that Plaintiff had two pending civil rights actions and one habeas corpus petition. (Dkt. No. 18-1 at 13.) The order also states: "Plaintiff needs access to, among other things, all legal documents, copying services, writing materials, the prison law library, as permitted by prison rules, to properly and adequately represent himself in the pending proceedings." (*Id.*)

[6] California Code of Regulations § 3122(a) provides, "Each facility shall provide legal materials through its law library to provide inmates with meaningful access to the courts." Cal. Code Regs. tit. 15, § 3122(a).  Section 3122(b) provides, in pertinent part:

> Inmates who have established court deadlines may apply for Priority Legal User (PLU) status to the prison law libraries.  Inmates who are granted PLU status based on their application shall receive higher priority to prison law library resources than other inmates.  All inmates who are not on PLU status are on General Legal User (GLU) status.
>
> > (1) An established court deadline may be either a court imposed deadline for an active case or a statutory deadline.  Inmates who apply for PLU status based on a court imposed deadline must show documentation from the court to verify that deadline.  Inmates who apply for PLU status based on a statutory deadline must identify the legal rule that compels the deadline.
> >
> > . . . .
> >
> > (6) An inmate may receive PLU status within 30 calendar days of his or her established court deadline unless the inmate can demonstrate need for a longer period of PLU status based on extraordinary circumstances beyond the inmate's control.

Cal. Code Regs. tit. 15, § 3122(b)(1), (b)(6).

Plaintiff tried to give Sterling the CDCR Form 22, but was refused.  (*Id.* at 3.) Consequently, Plaintiff forwarded the request to Sterling's direct supervisor, Balakian, who Plaintiff believes instructed Sterling to respond.  (*Id.*)  Plaintiff alleges that Sterling, in her response,

> failed to controvert Plaintiff's verbatim account of what K. Sterling stated about the PLU process, and, instead, raised a moot issue concerning Plaintiff giving K. Sterling's inmate clerk the informal request to give to her, even though these same clerks handle and make copies of inmate litigants['] sensitive legal documents.

(*Id.*)  Plaintiff resubmitted the informal response for supervisor review, but received no response from Balakian.  (*Id.*)[7]

Plaintiff alleges Sterling retaliated against him on April 2, 2014 for exercising his right to redress grievances and right to law library access, by instructing L. Acosta, a trainee of less than a month, to issue a CDCR 128A Chrono Report alleging misconduct by Plaintiff.  (*Id.*)  The CDCR 128A Chrono Report stated:

> On Wednesday, April 02, 2014, at approximately 1315 hours, while performing my duties as Facility "D" LTA (A); I observed Inmate INGRAM, AE-6335 (D19-220L) entering the law library.  During the time that INGRAM was inside the library, I entered the Staff restroom.  Through the Staff restroom door, I could hear an escalating conversation between INGRAM and my colleague Ms. K. Sterling who is the Facility "D" Librarian.  The conversation was at such a loud tone, it was very discernable [sic] through the Staff bathroom door.  I then came out of the restroom and advised INGRAM that he needed to step away from the out-of-bounds area that was clearly posted.  INGRAM did not comply with my direct order the first time.  I then ordered INGRAM a second time to leave the library to which he finally complied with my direct order and exited the library.

---

[7] Sterling responded to Plaintiff's April 2, 2014 CDCR Form 22 on April 15, 2015, stating that clerks are not allowed to hand a CDCR Form 22 from an inmate to staff, in accordance with California Code of Regulations § 3086.  (Dkt. No. 18-1 at 15.)  Rather, the forms must be given to personnel directly or mailed to staff from an inmate.  (*Id.*)  California Code of Regulations § 3086 of Title 15 provides, in pertinent part:

> When seeking response to a written request for an interview, item, or service, the inmate . . . shall complete the Request for Interview, Item or Service form to describe his or her request. The inmate shall deliver or mail via institutional mail the completed form to any staff member who is able to respond to the issue.

Cal. Code Regs. tit. 15, § 3086(e).

(*Id.* at 17.)  Plaintiff alleges that the CDCR 128A Chrono Report did not reasonably advance any penal goal, and that it was reasonably inferable that the trainee issued the report at the instruction of Sterling.  (*Id.* at 3.)

On April 5, 2014, Plaintiff attempted to renew his PLU status by submitting a PLU Request and Declaration.  (*Id.* at 4, 19–20, 22.)  Sterling again refused to grant him PLU status.  (*Id.*)  Plaintiff alleges Sterling "sought to make an incident alleging that Plaintiff was out-of-bounds," and contacted custody.  (*Id.* at 4.)  When custody arrived, Plaintiff explained the situation and handed a prepared CDCR Form 22 to one of the correctional officers, who hand-delivered it to Sterling.  (*Id.*)

In the CDCR Form 22, Plaintiff stated that when he attempted to obtain PLU status, "Sterling became belligerent, refused to grant status [and] adhere to established rules or exception[s], and falsely accused [him] of threats, manipulation, etc."  (*Id.* at 22.)  He "tried to defend [and] explain" himself, and gave Sterling notice that he "would appeal to her supervisors."  (*Id.*)  Sterling responded to the CDCR Form 22 on the same day, stating that what Plaintiff presented for PLU status was not in accordance with Title 15, California Code of Regulations §§ 3122(b)(1) and (b)(6).  (*Id.*)  Plaintiff requested supervisor review on April 6, 2014, but alleges Balakian never responded.  (*Id.* at 4, 22.)

Plaintiff alleges Sterling retaliated against Plaintiff on April 5, 2014 "for seeking to redress/appeal another reasonable right to access issue" by falsely charging him with a serious CDCR 115 Rule Violation Report ("RVR") for "Disobeying a Direct Order."  (*Id.* at 3–4.)  Sterling signed and dated the RVR on April 11, 2014.  (*Id.* at 24.)  In the RVR, Sterling stated:

> On Saturday, April 05, 2014, at approximately 1030 hours, while performing my duties as Facility "D" Librarian (A); I observed Inmate INGRAM, AE-6335 (D19-220L) entering the Facility "D" Law Library out of his tier rotation yard schedule. I had already verbally counseled INGRAM on 04/02/14 and 04/03/14 regarding his unauthorize[d] entry into the law library out of his tier rotation.  I then gave INGRAM a direct order to exit the law library, at which time, he refused to comply with my order by becoming belligerent and argumentative with me for several

minutes[.]  I informed INGRAM that I would activate my Personal Alarm Device (PAD) if he did not leave.  I then contacted the Facility "D" Program Office for further assistance, at which time, INGRAM voluntarily left without further incident.  This concludes my report.  Inmate INGRAM is aware of this report.

(*Id.*)

On April 17, 2014, Plaintiff was found not guilty of the RVR, and the charges were dismissed "in good cause."  (*Id.* at 25.)  The dismissal stated: "[A] review of the yard schedule indicated that the top tier was out for a.m. yard, and [Plaintiff] is currently assigned to the top tier."  (*Id.*)  The RVR was removed from Plaintiff's Central File.  (*Id.* at 27.)

## II.    Count 2

After the prior RVR was adjudicated in Plaintiff's favor, custodial officials instructed Plaintiff not to enter the law library on "off-tier" rotation, "without custody supervision and approval," and to "ask K. Sterling for permission to enter."  (*Id.* at 5–6.) Plaintiff contacted Officer Seagram and explained his intention to make copies at the law library and effectuate service of process.  (*Id.*)  Officer Seagram approved the request, but warned Plaintiff that if Sterling said "No," Plaintiff should leave the law library without further incident.  (*Id.*)  On April 26, 2014, Plaintiff followed instructions and made the request to Sterling, which Sterling denied.  (*Id.*)  Plaintiff then left, "pending afternoon library session on Plaintiff's tier rotation."  (*Id.*)

That afternoon, Plaintiff went to the law library and processed two separate sets of items to copy, including exhibits from the dismissed RVR (for attachment to a CDCR 602 Appeal) and a settlement conference request motion.  (*Id.* at 5–6, 29–30.)  Plaintiff alleges that Sterling, for the first time, handled his copy job herself, and in addition to making Plaintiff's copies, made copies for herself.  (*Id.* at 5–6.)  Plaintiff alleges that although he watched her make copies for herself, she lied about making the copies and attempted to conceal the "illegally copied documents."  (*Id.*)  Sterling's inmate clerks, rather than Sterling herself, usually make copies.  (*Id.*)

1   After making copies for both herself and Plaintiff, Sterling notified Plaintiff that he

2   would be receiving another RVR for "Disobeying a Direct Order" for being "out-of-

3   bounds" again.  (*Id.* at 5–6, 36.)  The RVR, issued by Sterling on May 6, 2014, alleges

4   Plaintiff "refused to sign the sign-in/sign-out sheet, entered a restricted area, and refused

5   a direct order."  (*Id.* at 36.)  Plaintiff alleges that Sterling issued the RVR in retaliation for

6   Plaintiff's attempt to seek redress and appeal a reasonable right to library access.  (*Id.* at

7   5–6.)  Plaintiff further alleges that he was engaged in the protected conduct of filing a

8   grievance at the time Sterling gave notice, and that Sterling's copying of his documents

9   for herself was an attempt to "chill" his grievance process.  (*Id.*)

10   Plaintiff alleges that Sterling further retaliated against him on April 26, 2014 by

11   issuing a CDCR 128A Chrono Report for documenting in the copy log book that she

12   made copies of his documents for herself.  (*Id.*)  In the CDCR 128A Chrono Report,

13   Sterling stated that Plaintiff "intentionally introduced false information on [a]

14   document/record maintained by the CDCR's Education/Library program" when he wrote

15   "Ms. Sterling took copies (4) herself → of 602 exhibits" on the "Copy List" log.  (*Id.* at

16   34.)  Sterling further stated that Plaintiff was in "direct violation of CCR Section § 3021"

17   by intentionally entering and introducing false information upon a record or document

18   maintained by CDCR's Education/Library Program.  (*Id.*)  Plaintiff alleges his conduct

19   was protected because he was documenting Sterling's conduct for appeal purposes.  (*Id.*

20   at 5–6.)

21   On April 26, 2014, after Plaintiff finished at the law library, he submitted another

22   CDCR Form 22, which was signed off by and delivered to Sterling by Sergeant

23   Bettingger.  (*Id.* at 6, 32.)  He received no response.  (*Id.* at 6.)

24   On May 10, 2014, Plaintiff was found not guilty of the May 6, 2014 RVR, and the

25   charges were dismissed "in good cause."  (*Id.* at 39.)  The dismissal order stated that "the

26   Reporting Employee failed to identify the direct order given, and the direct order that

27   [Plaintiff] failed to follow."  (*Id.*)  The RVR was removed from Plaintiff's Central File.

28   (*Id.* at 39, 41.)

Plaintiff alleges that he submitted CDCR 602 Appeals on these issues on April 28, 2014 and May 13, 2014.[8]  (*Id.* at 6.)  Plaintiff contends that his factual allegations of "Employee Misconduct – Course of Conduct" were misconstrued as a "Disciplinary" matter, and as a result, the merits of his claims were not reached.  (*Id.*)  Plaintiff alleges the administrative appeals process was ineffective in addressing his retaliation claims.  (*Id.*)

### III.    Count 3

Plaintiff alleges that on October 17, 2014, Sterling retaliated against Plaintiff by falsely charging him with an RVR for "Behavior Which Might Lead to Violence."  (*Id.* at 7, 61.)  As a result of the RVR, Plaintiff was placed in Administrative Segregation ("Ad-Seg"); his privileges were reduced; his job and pay were terminated; and he was transferred from RJD to CSP-Corcoran.  (*Id.* at 7–8.)  Plaintiff alleges this incident was part of an ongoing course of conduct of retaliation by Sterling, and that if CDCR had properly characterized his earlier CDCR 602 Appeal, this incident could have been prevented.  (*Id.*)

On October 17, 2014, Plaintiff sought to make copies of a motion for one of his three pending Central District of California proceedings and to obtain a certified trust account statement to file an *in forma pauperis* application for a new case in the Southern District of California.  (*Id.* at 7, 56–59.)  Plaintiff alleges Sterling refused to process the application because she observed that he was attempting to initiate a case in the Southern District of California.  (*Id.* at 7.)  He further alleges that the following conversation occurred:

> Sterling: "Your application is incomplete."
> Plaintiff: "How is that?  I've filled out relevant sections."
> Sterling: "You have to state your defendants."

---

[8] The April 28, 2014 CDCR 602 Appeal concerns the incidents on April 2, 2014 and April 5, 2014. (Dkt. No. 18-1 at 42–47.)  The May 13, 2014 CDCR 602 Appeal concerns Sterling's ongoing conduct and references incidents on April 2, 2014, April 5, 2014, April 16, 2014, and April 26, 2014.  (*Id.* at 48–54.)  Plaintiff sought to have it classified as a Staff Complaint.  (*Id.* at 50.)

Plaintiff: "No, I don't!  I've stated a [*Bivens*] Claim.  You can't tell me how to litigate my case."

Sterling: "I'm not processing your application.  I'm tired of going through this stuff with you."

Plaintiff: "Well, you haven't seen anything yet."

(*Id.* at 7–8.)

Plaintiff alleges that no threats were implied or stated, and that Sterling did not activate her PAD at that time, per institution policy and procedure.  (*Id.* at 8.)  Rather, Sterling waited approximately five hours to file her allegedly false charges in an RVR, stating that she was "verbally threatened" and did not feel safe around Plaintiff.  (*Id.* at 8, 61.)  Plaintiff alleges that Sterling's actions chilled his access to the courts.  (*Id.* at 8.)  As a result of the RVR, Plaintiff was placed in Ad-Seg on October 17, 2014.  (*Id.* at 72.)

On October 23, 2014, Plaintiff appeared before the Institution Classification Committee ("ICC") for an Ad-Seg review.  (*Id.* at 8, 71–74.)  Plaintiff alleges Defendant Seibel was in attendance and failed to respond, which resulted in Plaintiff being released to a different facility pending transfer, with reduced privileges.  (*Id.* at 8, 73.)  He further alleges a "subsequent emergency appeal on this matter went unanswered."  (*Id.* at 8, 10.)

On November 6, 2014, Plaintiff was found not guilty of the October 2014 RVR, and the charges were dismissed "in good cause."  (*Id.* at 8, 61–67.)  The RVR was removed from his Central File.  (*Id.* at 66.)  Plaintiff contends that "[c]ustody is well aware of an on-going issue between K. Sterling and inmate litigants."  (*Id.* at 8.)  Plaintiff lists cases and attaches letters and grievances involving Sterling, alleging that her supervisors, including Defendant Paramo, were aware of her conduct towards inmates and should have prevented her constitutional violations.  (*Id.* at 7–8.)

On July 9, 2015, Plaintiff was transferred to CSP-Corcoran, allegedly as a direct result of the retaliatory conduct of Sterling.  (*Id.* at 8.)[9]

---

[9] The ICC review states that Plaintiff's transfer "is considered adverse because his behavior with Librarian Sterling is the cause of the transfer."  (Dkt. No. 18-1 at 73.)

**PROCEDURAL HISTORY**

Plaintiff commenced this action on November 12, 2014, by filing a Complaint and motion for leave to proceed *in forma pauperis*. (Dkt. Nos. 1, 2.) On December 31, 2014, Plaintiff filed a First Amended Complaint ("FAC"). (Dkt. No. 3.) On February 9, 2015, the Court granted Plaintiff's motion for leave to proceed *in forma pauperis* and, following an initial screening of the FAC pursuant to 28 U.S.C. §§ 1915(e)(2) and 1915A(b), directed the U.S. Marshal to effect service of the FAC on Plaintiff's behalf. (Dkt. No. 4.)

Defendants filed a Motion to Dismiss Plaintiff's FAC on May 4, 2015. (Dkt. No. 10.) On December 15, 2015, United States Magistrate Judge David H. Bartick issued a Report and Recommendation recommending that this Court grant Defendants' Motion to Dismiss the FAC, with leave to amend. (Dkt. No. 16.) This Court adopted the Report and Recommendation on March 29, 2016, and granted in part and denied in part Defendants' Motion to Dismiss. (Dkt. No. 17.) Plaintiff was given leave to file an amended complaint on or before May 1, 2016. (*Id.* at 22.)

On April 15, 2016, Plaintiff filed his SAC. (Dkt. No. 18-1.) Defendants filed a Motion to Dismiss Portions of Plaintiff's SAC on April 28, 2016. (Dkt. No. 22.) Plaintiff filed an opposition, and Defendants filed a reply. (Dkt. Nos. 23, 26.) On May 23, 2016, Plaintiff filed a Motion for Entry of Default, arguing he was entitled to entry of default on Counts 1 and 2 because Defendants only filed a partial motion to dismiss. (Dkt. No. 25.) The Court denied the motion on August 16, 2016. (Dkt. No. 28.)

Judge Porter filed the instant Report on January 31, 2017. (Dkt. No. 29.) No objections have been filed. (Dkt. No. 30.)

**LEGAL STANDARDS**

**I.     Authority of Magistrate Judges**

Federal Rule of Civil Procedure 72(b) and 28 U.S.C. § 636(b)(1) set forth a district judge's duties in connection with a magistrate judge's report and recommendation. The district judge must "make a de novo determination of those portions of the report to

which objection is made," and "may accept, reject, or modify, in whole or in part, the finding or recommendations made by the magistrate judge."  28 U.S.C. § 636(b)(1); *see also United States v. Remsing*, 874 F.2d 614, 617 (9th Cir. 1989).  But "[t]he statute makes it clear that the district judge must review the magistrate judge's findings and recommendations de novo *if objection is made, but not otherwise." *United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003) (en banc) (emphasis in original); *see also Schmidt v. Johnstone*, 263 F. Supp. 2d 1219, 1226 (D. Ariz. 2003) (concluding that where no objections were filed, the district court had no obligation to review the magistrate judge's report).  "Neither the Constitution nor the statute requires a district judge to review, *de novo*, findings and recommendations that the parties themselves accept as correct."  *Id.*  "When no objections are filed, the *de novo* review is waived." *Marshall v. Astrue*, No. 08cv1735, 2010 WL 841252, at *1 (S.D. Cal. Mar. 10, 2010) (adopting report in its entirety without review because neither party filed objections to the report despite the opportunity to do so).

## II.    Federal Rule of Civil Procedure 12(b)(6)

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "tests the legal sufficiency of a claim."  *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).  Because Rule 12(b)(6) focuses on the "sufficiency" of a claim rather than the claim's substantive merits, "a court may [ordinarily] look only at the face of the complaint to decide a motion to dismiss."  *Van Buskirk v. Cable News Network, Inc.*, 284 F.3d 977, 980 (9th Cir. 2002).  However, courts may consider exhibits that are attached to the complaint.  *See* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes."); *Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.*, 896 F.2d 1542, 1555 n.19 (9th Cir. 1990) (citing *Amfac Mortg. Corp. v. Ariz. Mall of Tempe, Inc.*, 583 F.2d 426 (9th Cir. 1978)) ("[M]aterial which is properly submitted as part of the complaint may be considered" in ruling on a Rule 12(b)(6) motion to dismiss.).  However, exhibits that contradict the allegations of a complaint may fatally undermine the complaint's allegations.  *See Sprewell v. Golden State Warriors*, 266 F.3d

979, 988 (9th Cir. 2001) (a plaintiff can "plead himself out of a claim by including . . .
details contrary to his claims." (citing *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293,
1295–96 (9th Cir. 1998) ("[W]e are not required to accept as true conclusory allegations
which are contradicted by documents referred to in the complaint."))).

A motion to dismiss should be granted if a plaintiff fails to proffer "enough facts to
state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S.
544, 570 (2007). "To survive a motion to dismiss, a complaint must contain sufficient
factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' A
claim has facial plausibility when the plaintiff pleads factual content that allows the court
to draw the reasonable inference that the defendant is liable for the misconduct alleged."
*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556, 570)
(internal citation omitted).

"All allegations of material fact are taken as true and construed in the light most
favorable to the nonmoving party." *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337–38
(9th Cir. 1996) (citing *Nat'l Wildlife Fed. v. Espy*, 45 F.3d 1337, 1340 (9th Cir. 1995)).
The Court need not, however, "accept as true allegations that are merely conclusory,
unwarranted deductions of fact, or unreasonable inferences." *Sprewell*, 266 F.3d at 988
(citing *Clegg v. Cult Awareness Network*, 18 F.3d 752, 754–55 (9th Cir. 1994)); *see also
Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action,
supported by mere conclusory statements, do not suffice."); *Papasan v. Allain*, 478 U.S.
265, 286 (1986) (on motion to dismiss, court is "not bound to accept as true a legal
conclusion couched as a factual allegation."). "[T]he pleading standard Rule 8 announces
does not require 'detailed factual allegations,' but it demands more than an unadorned,
the defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (quoting
*Twombly*, 550 U.S. at 555).

Thus, "[w]hile legal conclusions can provide the framework of a complaint, they
must be supported by factual allegations. When there are well-pleaded factual
allegations, a court should assume their veracity and then determine whether they

1   plausibly give rise to an entitlement to relief." *Id.* at 679. "The plausibility standard is

2   not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a

3   defendant has acted unlawfully." *Id.* at 678. "Where a complaint pleads facts that are

4   'merely consistent with' a defendant's liability, it 'stops short of the line between

5   possibility and plausibility of 'entitlement to relief.'"" *Id.* (quoting *Twombly*, 550 U.S. at

6   570 (when plaintiffs have not "nudged their claims across the line from conceivable to

7   plausible, their complaint must be dismissed")).

8       "In sum, for a complaint to survive a motion to dismiss, the non-conclusory

9   'factual content,' and reasonable inferences [drawn] from that content, must be plausibly

10   suggestive of a claim entitling the plaintiff to relief." *Moss v. United States Secret Serv.*,

11   572 F.3d 962, 969 (9th Cir. 2009) (quoting *Iqbal*, 556 U.S. at 678).

12   **III.   Standards Applicable to *Pro Se* Litigants in Civil Rights Actions**

13       "In civil rights cases where the plaintiff appears *pro se*, the court must construe the

14   pleadings liberally and must afford [the] plaintiff the benefit of any doubt." *Karim-*

15   *Panahi v. L.A. Police Dep't*, 839 F.2d 621, 623 (9th Cir. 1988). The rule of liberal

16   construction is "particularly important in civil rights cases." *Ferdik v. Bonzelet*, 963 F.2d

17   1258, 1261 (9th Cir. 1992). The rule, however, "applies only to a plaintiff's factual

18   allegations." *Neitzke v. Williams*, 490 U.S. 319, 330 n.9 (1989). In giving liberal

19   interpretation to a *pro se* civil rights complaint, courts may not "supply essential elements

20   of claims that were not initially pled." *Ivey v. Bd. of Regents of the Univ. of Alaska*, 673

21   F.2d 266, 268 (9th Cir. 1982). "Vague and conclusory allegations of official

22   participation in civil rights violations are not sufficient to withstand a motion to dismiss."

23   *Id.*; *see also Jones v. Cmty. Redev. Agency*, 733 F.2d 646, 649 (9th Cir. 1984) (finding

24   conclusory allegations unsupported by facts insufficient to state a claim under § 1983).

25       Nevertheless, a court must give a *pro se* litigant leave to amend his complaint

26   "unless it determines that the pleading could not possibly be cured by the allegation of

27   other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc) (quotation

28   omitted) (citing *Noll v. Carlson*, 809 F.2d 1446, 1447 (9th Cir. 1987)). Thus, before a

*pro se* civil rights complaint may be dismissed, the Court must provide the plaintiff with a statement of the complaint's deficiencies. *Karim-Panahi*, 839 F.2d at 623–24. But where amendment of a *pro se* litigant's complaint would be futile, denial of leave to amend is appropriate. *James v. Giles*, 221 F.3d 1074, 1077 (9th Cir. 2000).

## DISCUSSION

42 U.S.C. § 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred." *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979). Under § 1983, a claimant must prove: (1) that a person acting under color of state law committed the conduct at issue; and (2) that the conduct deprived the claimant of some right, privilege, or immunity protected by the Constitution or laws of the United States. *See* 42 U.S.C. § 1983; *Parratt v. Taylor*, 451 U.S. 527, 535 (1981), *overruled on other grounds by Daniels v. Williams*, 474 U.S. 327, 328 (1986); *Haygood v. Younger*, 769 F.2d 1350, 1354 (9th Cir. 1985) (en banc).

Here, there appears to be no dispute that Defendants acted under color of state law in their official capacities as employees of RJD. "[G]enerally, a public employee acts under color of state law while acting in his [or her] official capacity or while exercising his [or her] responsibilities pursuant to state law." *West v. Atkins*, 487 U.S. 42, 50 (1988). Plaintiff's claims turn on the second inquiry—whether Defendants deprived Plaintiff "of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. 42 U.S.C. § 1983.

Defendants first contend that Count 3 must be dismissed without prejudice and without leave to amend, because Plaintiff failed to exhaust his administrative remedies prior to filing suit. (Dkt. No. 22-1 at 16–18.) Defendants next contend that Plaintiff does not state a retaliation claim in Count 3, because Plaintiff has not met his burden of pleading the absence of legitimate correctional goals, and because Defendant Sterling is qualifiedly immune. (*Id.* at 18–22.) Defendants further contend that Plaintiff does not state free speech claims, (*id.* at 22–23); claims for the right to redress grievances, (*id.* at 23–24); claims for deliberate indifference against Defendants Balakian, Seibel, and

Paramo, (*id.* at 24); and claims for supervisory liability against Defendants Balakian, Seibel, and Paramo, (*id.* at 24–27).

## I.   Exhaustion

Under the Prison Litigation Reform Act ("PLRA"), "[n]o action shall be brought with respect to prison conditions under . . . [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Exhaustion under § 1997e(a) is "mandatory." *Porter v. Nussle*, 534 U.S. 516, 524 (2002) (citing *Booth v. Churner*, 532 U.S. 731, 739 (2001)); *McKinney v. Carey*, 311 F.3d 1198, 1200–01 (9th Cir. 2002). Failure to exhaust is "an affirmative defense the defendant must plead and prove." *Jones v. Bock*, 549 U.S. 199, 204 (2007).

"In a typical PLRA case, a defendant will have to present probative evidence [in a Rule 56 motion for summary judgment] . . . that the prisoner has failed to exhaust administrative remedies under § 1997e(a)." *Albino v. Baca*, 747 F.3d 1162, 1169 (9th Cir. 2014) (en banc). However, "in . . . rare cases where a failure to exhaust is clear from the face of the complaint, a defendant may successfully move to dismiss under Rule 12(b)(6) for failure to state a claim." *Id.* (citing *Jones*, 549 U.S. at 215–16; *Scott v. Kuhlmann*, 746 F.2d 1377, 1378 (9th Cir. 1984) (per curiam) ("[A]ffirmative defenses may not be raised by motion to dismiss, but this is not true when, as here, the defense raises no disputed issues of fact."); *Aquilar-Avellaveda v. Terrell*, 478 F.3d 1223, 1225 (10th Cir. 2007) ("[O]nly in rare cases will a district court be able to conclude from the face of the complaint that a prisoner has not exhausted his administrative remedies and that he is without a valid excuse.")).

The Supreme Court has "held that to properly exhaust administrative remedies prisoners must 'complete the administrative review process in accordance with the applicable procedural rules,' [which] are defined not by the PLRA, but by the prison grievance process itself." *Jones*, 549 U.S. at 218 (quoting *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)). However, "failure to exhaust a remedy that is effectively unavailable does

not bar a claim from being heard in federal court." *McBride v. Lopez*, 807 F.3d 982, 986 (9th Cir. 2015) (holding that "the threat of retaliation for reporting an incident can render the prison grievance process effectively unavailable and thereby excuse a prisoner's failure to exhaust administrative remedies").

The administrative appeal system for inmates in the California prison system is codified in Title 15 of the California Code of Regulations.[10]  *See* Cal. Code Regs. tit. 15, § 3084.1 *et seq.*  Generally, "[a]ll appeals shall be responded to and returned to the inmate or parolee by staff" at the first level of review within thirty working days from date of receipt by the appeals coordinator.  Cal. Code Regs. tit. 15, § 3084.8(c)(1).  There is an exception, however, for appeals accepted as emergency appeals.  *See* Cal. Code Regs. tit. 15, § 1084.8(f).  "An appeal accepted as an emergency appeal shall be processed within the time frames set forth in subsections 3084.9(a)(4) and (a)(5)."  *Id.* Subsection 3084.9(a)(4) in turn provides that "[i]f emergency processing is warranted, the first level shall be waived and the second level review shall be completed within five working days."  Cal. Code Regs. tit. 15, § 3084.9(a)(4).

The Code cautions that "[e]mergency appeals should not be used by inmates or parolees as a substitute for verbally or otherwise informing staff of an emergency situation requiring immediate response."  Cal. Code Regs. tit. 15, § 3084.9(a).  Rather, "[w]hen circumstances are such that the regular appeal time limits would subject the inmate or parolee to a substantial risk of personal injury or cause other serious and irreparable harm, the appeal shall be processed as an emergency appeal."  Cal. Code Regs. tit. 15, § 3084.9(a)(1).

Here, Plaintiff alleges that on October 17, 2014, Sterling retaliated against Plaintiff by falsely charging him with an RVR, and that as a result of the RVR, Plaintiff was

---

[10] The Magistrate Judge provided a detailed overview of the administrative appeal system in her Report. (*See* Dkt. No. 29 at 16–18.)  For brevity, the Court will not repeat Judge Porter's thorough overview here.

placed in Ad-Seg that same day. (Dkt. No. 18-1 at 7, 61, 72.) On October 23, 2014, Plaintiff appeared before the ICC for an Ad-Seg review. (*Id.* at 8, 71–74.) Although he does not specify the date of his appeal, Plaintiff alleges a "subsequent emergency appeal on this matter went unanswered." (*Id.* at 8, 10.)

Defendants contend that Plaintiff admits on the face of his SAC that he failed to exhaust administrative remedies for Count 3 before filing the instant action. (Dkt. No. 22-1 at 16–18.) Specifically, Defendants argue that pursuant to the thirty-day deadline provided by CDCR's inmate administrative appeal system, prison officials had until December 9, 2014 to provide a response—Plaintiff could not possibly have exhausted his appeal prior to commencing this action on November 12, 2014. (*Id.*) Defendants further argue that Plaintiff has not sufficiently alleged that he was entitled to an emergency appeal, as he "would not have been subject to serious and irreparable harm by going through the regular grievance procedure timelines for his complaint," and as "Plaintiff admits that he would only suffer 'reduced privileges.'" (*Id.* at 18.) Finally, Defendants argue that inmates can grieve a transfer only after a classification staff representative has actually issued a transfer endorsement. (*Id.* (citing Cal. Code Regs. tit. 15, § 3084.9(h)).) As Plaintiff, by his own admission, was not transferred until July 9, 2015, Plaintiff prematurely filed the instant action. (*Id.*)

Plaintiff responds that his allegation that his "subsequent emergency appeal . . . went unanswered" is sufficient to demonstrate exhaustion for purposes of a motion to dismiss. (Dkt. No. 23 at 13.) Plaintiff further argues that the "failure to respond" evidenced "the unavailability of remedy," and that "any further administrative action on his part would have been futile," given the mischaracterization and denial of his prior grievance. (*Id.* at 13–14.) Plaintiff does not shed any light on when he filed the emergency appeal, or name the underlying basis for the emergency appeal.

While Defendants argue that Plaintiff could not have exhausted his appeal prior to filing the instant action, Defendants' argument is premised upon the thirty-day deadline for routine appeals, not the expedited timeline for emergency appeals. Assuming

Plaintiff filed an emergency appeal on October 23, 2014, if Plaintiff's appeal warranted emergency processing, a response from prison officials was due within five working days, *see* Cal. Code Regs. tit. 15, § 3084.9(a)(4), well before Plaintiff filed the instant action on November 12, 2014.  While the Court is mindful of the limited availability and scope of emergency appeals, *see* Cal. Code Regs. tit. 15, § 3084.9(a), the Court notes at the same time that Defendants have raised the issue of exhaustion in a motion to dismiss, not a motion for summary judgment.  In light of the Ninth Circuit's reminder that "a plaintiff is not required to say *anything* about exhaustion in his complaint," *Albino*, 747 F.3d at 1169 (emphasis added), the Court declines to conclude, without a developed record, that failure to exhaust is clear from the face of Plaintiff's SAC.

Furthermore, "improper screening of an inmate's administrative grievances renders administrative remedies 'effectively unavailable' such that exhaustion is not required under the PLRA."  *Sapp v. Kimbrell*, 623 F.3d 813, 823 (9th Cir. 2010).  "[P]rison officials' failure to respond to a properly filed grievance makes remedies 'unavailable' and therefore excuses a failure to exhaust."  *Id.* (citing *Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006)).  Accordingly, if Plaintiff properly filed an emergency appeal, and prison officials in fact failed to respond, Plaintiff's failure to exhaust is excused.

As the Magistrate Judge noted, "Plaintiff was not required to attach his emergency appeal to the SAC, which he has not, or allege the foundation for his emergency appeal, which he has not." (Dkt. No. 29 at 18.)  Given the rarity of cases in which a prisoner's failure to exhaust may be clear from the face of the complaint, *see Albino*, 747 F.3d at 1169, and given the lack of information about Plaintiff's emergency appeal, the response by prison officials or lack thereof, or the basis for the alleged emergency, the Court declines to conclude at this stage that Plaintiff has failed to exhaust his administrative remedies for Count 3.

Accordingly, the Court **DENIES** Defendants' motion to dismiss Plaintiff's Count 3 on the basis of exhaustion.

/ / / /

## II.   Retaliation

"The First Amendment guarantees a prisoner a right to seek redress of grievances from prison authorities and as well as a right of meaningful access to the courts." *Jones v. Williams*, 791 F.3d 1023, 1035 (9th Cir. 2015); *see also Soranno's Gasco, Inc. v. Morgan*, 874 F.2d 1310, 1314 (9th Cir. 1989) ("The right of access to the courts is subsumed under the first amendment right to petition the government for redress of grievances."). "Retaliation against prisoners for their exercise of this right is itself a constitutional violation, and prohibited as a matter of 'clearly established law.'" *Brodheim v. Cry*, 584 F.3d 1262, 1269 (9th Cir. 2009); *see also Rhodes v. Robinson*, 408 F.3d 559, 567 (9th Cir. 2005); *Pratt v. Rowland*, 65 F.3d 802, 806 & n.4 (9th Cir. 1995) ("[T]he prohibition against retaliatory punishment is 'clearly established law' in the Ninth Circuit, for qualified immunity purposes.  That retaliatory actions by prison officials are cognizable under § 1983 has also been widely accepted in other circuits.").

Within the prison context, a viable claim of First Amendment retaliation requires: "(1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Brodheim*, 584 F.3d at 1269 (quoting *Rhodes*, 408 F.3d at 567–68).  Here, Defendants dispute only the fifth element as to Plaintiff's Count 3.  (Dkt. No. 29 at 18–19.)

### A. Absence of Legitimate Correctional Goal

"To prevail on a retaliation claim, a prisoner must show that the challenged action 'did not reasonably advance a legitimate correctional goal.'" *Brodheim*, 584 F.3d at 1271 (quoting *Rhodes*, 408 F.3d at 568).  "The plaintiff bears the burden of pleading and proving the absence of legitimate correctional goals for the conduct of which he complains." *Pratt*, 65 F.3d at 806.

Here, Defendants contend that Plaintiff fails to state a retaliation claim in Count 3 because he "has not met his burden of pleading the absence of legitimate correctional

goals for the allegedly retaliatory action of reporting [Plaintiff's] comment for investigation." (Dkt. No. 22-1 at 19.) Specifically, Defendants argue that "[r]eporting interactions with inmates that might be of a threating [sic] nature for investigation serves the correctional goals of ensuring staff safety, and of reminding inmates that they need to be respectful when they interact with staff and need to think about how their comments might be interpreted." (*Id.*)

However, construing Plaintiff's allegations in the light most favorable to him, the Court concludes that Plaintiff has met his burden of pleading the absence of legitimate correctional goals for Sterling's allegedly retaliatory action. Sterling charged Plaintiff with an RVR for "Behavior Which Might Lead to Violence" for his comment, "Well, you haven't seen anything yet." (Dkt. No. 18-1 at 7–8, 61.) As Plaintiff observed, had she felt threatened by the possibility of imminent violence or harm to her safety, Sterling should have activated her PAD at that time, according to institution policy and procedure. (*Id.*) Sterling did not activate her PAD, despite reporting that Plaintiff "sat in a chair for approximately five (5) minutes staring at [her] in a hostile manner." (*Id.*) Rather, Sterling waited approximately five hours after the incident to file her charges in an RVR, in which she stated that she was "verbally threatened" and did not feel safe around Plaintiff. (*Id.*)

More tellingly, Plaintiff alleges that the interaction with Sterling occurred as he was seeking to initiate a § 1983 civil rights suit in this district. (*Id.*) Sterling was not only aware that Plaintiff intended to file a new lawsuit, but also aware that Plaintiff had previously filed multiple CDCR 602 appeals specifically naming Sterling—indeed, Plaintiff alleges that Sterling covertly copied Plaintiff's CDCR 602 materials for herself. (*Id.* at 7–8, 34, 61.) Sterling's statement that she would not process Plaintiff's application—after Plaintiff refused to answer Sterling who his defendants were—and that she was "tired of going through this stuff with [him]" lends plausibility to Plaintiff's allegation that Sterling was motivated by retaliatory animus to issue a false RVR against him. (*Id.*) The ultimate dismissal of the RVR charges further substantiates Plaintiff's

allegation that "[n]o threats were implied or stated" by his comment to Sterling.  (*Id.* at 8, 61–67.)  In fact, after a hearing, Plaintiff was determined to be not guilty—the hearing officer believed that Plaintiff "was telling the truth" when he insisted that his comment to Sterling was not a threat, but was made in response to Sterling and in reference to his civil case.  (*Id.* at 66.)   And finally, Plaintiff alleges an ongoing course of conduct of retaliation by Defendant Sterling.  (*Id.* at 7–8.)

Defendants' brief, "generic justification" for Sterling's reporting of Plaintiff's comment does not overcome Plaintiff's plausible allegations that Sterling's actions, "in this circumstance," furthered a retaliatory motive, rather than reasonably advancing legitimate correctional goals.  *See Shepard v. Quillen*, 840 F.3d 686, 692 (9th Cir. 2016) ("[P]rison officials may not defeat a retaliation claim on summary judgment simply by articulating a general justification for a neutral process, when there is a genuine issue of material fact as to whether the action was taken in retaliation for the exercise of a constitutional right.") (quoting *Bruce v. Ylst*, 351 F.3d 1283, 1289 (9th Cir. 2003)).  Based on the foregoing, the Court finds that Plaintiff has sufficiently alleged that Sterling's issuance of a false RVR did not reasonably advance a legitimate correctional goal.  *See id.* (citing *Rizzo v. Dawson*, 778 F.2d 527, 532 & n.4 (9th Cir. 1985) (finding that where a plaintiff asserts allegations, supported by facts, that a defendant's actions were retaliatory, he has "sufficiently alleged the retaliatory acts were not a reasonable exercise of prison authority and . . . did not serve any legitimate correctional goal")).

Accordingly, the Court **DENIES** Defendants' motion to dismiss Plaintiff's Count 3 for failure to state a claim.

### B. Qualified Immunity

Defendants contend that Sterling is entitled to qualified immunity due to the lack of a clearly established right.  (Dkt. No. 22-1 at 20–22.)

"Qualified immunity is an affirmative defense that must be raised by a defendant." *Groten v. California*, 251 F.3d 844, 851 (9th Cir. 2001).  Therefore, dismissal under Rule 12(b)(6), "is not appropriate unless [the court] can determine, based on the complaint

itself, that qualified immunity applies." *Id.* "Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). Courts have discretion to address these two prongs in any sequence it sees fit. *Id.*

"A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (internal citation and quotation marks omitted). While there need not be a case "directly on point," "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* (internal citation omitted). Courts should not "define clearly established law at a high level of generality." *Id.* (internal citation omitted). Rather, the "dispositive question is whether the violative nature of *particular* conduct is clearly established." *Id.* (internal citation and quotation marks omitted). "This inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id.* (internal citation and quotation marks omitted).

Here, the qualified immunity inquiry turns on the second prong. Defendants assert in four sentences that there was no clearly established right:

> The inquiry here is whether a reasonable prison librarian could have believed that she could report comments made to her by an inmate that could be broadly interpreted as threatening even though the comments could also be interpreted in a non-threatening manner. That constitutional question "is by no means open and shut." *See Wilson*, 526 U.S. at 615.

(Dkt. No. 22 at 22.)

Defendants make no attempt to address the fact that a prisoner's general right against retaliatory punishment was clearly established well before October 2014. *Shepard*, 840 F.3d at 693 (citing *Rhodes*, 408 F.3d at 569, a 2005 decision); *see also Bruce*, 351 F.3d at 1289–90. Nor do Defendants provide any justification for unduly narrowly framing the clearly established right at issue. While Defendants focus on

Sterling's act of reporting Plaintiff's comment, Defendants skirt over the retaliatory motive underlying Sterling's act. *See Shepard*, 840 F.3d at 694 (emphasizing that it is clearly established that "prison officials may not abuse a valid procedure 'as a cover or a ruse to silence and punish' an inmate" (citing *Bruce*, 351 F.3d at 1289)). There is ample support in Plaintiff's SAC that Plaintiff's statement was not threatening and was made in reference to his civil lawsuit. Indeed, the hearing officer concluded that Plaintiff was telling the truth, and dismissed the RVR charges. (*See* Dkt. No. 18-1 at 7–8, 61, 66.) As explained above, *supra* Part I, Plaintiff has sufficiently alleged that Sterling "was motivated by retaliatory animus," in which case Sterling "would have been 'knowingly violat[ing] the law'" and not entitled to qualified immunity. *Shepard*, 840 F.3d at 693 (quoting *al-Kidd*, 563 U.S. at 743) (reversing summary judgment for defendant officer and denying quality immunity defense, despite the fact that a jury could conclude that the officer "was relying on what he reasonably thought was a prison policy," because a jury could also determine that the officer "was motivated by retaliatory animus"). In light of the above, the Court concludes that Defendants have not carried their burden of establishing that Sterling is entitled to qualified immunity for Plaintiff's Count 3.

Accordingly, the Court **DENIES** Defendants' motion to dismiss Plaintiff's Count 3 on the basis of qualified immunity.

## III.   Right to Redress Grievances and Right to Free Speech

Defendants next contend that Plaintiff fails to state claims for free speech and the right to redress grievances in Counts 1, 2, and 3. (Dkt. No. 22-1 at 22–24.)

Although Defendants construe Plaintiff's SAC as alleging separate claims for First Amendment retaliation, free speech, and the right to redress grievances, the Magistrate Judge concluded, and this Court agrees, that Plaintiff's SAC does not allege separate claims. Rather, the face of the SAC indicates, and Plaintiff's opposition brief confirms, that Plaintiff's core claim is that Defendants retaliated against him for engaging in protected First Amendment conduct; Plaintiff's invocation of the right to free speech and right to redress grievances is subsumed within his First Amendment retaliation claim.

1   (*See* Dkt. No. 18-1 at 7–8; Dkt. No. 23 at 22–23.)  It is clearly established that "[o]f
2   fundamental import to prisoners are their First Amendment 'right[s] to file prison
3   grievances,' and to 'pursue civil rights litigation in the courts.'"  *Rhodes*, 408 F.3d at 567
4   (internal citations omitted).  "Without those bedrock constitutional guarantees, inmates
5   would be left with no viable mechanism to remedy prison injustices."  *Id.*  "The right of
6   access to the courts is subsumed under the [F]irst [A]mendment right to petition the
7   government for redress of grievances."  *Sorrano's Gasco, Inc.*, 874 F.2d at 1314.

8       In his SAC, Plaintiff alleges that Sterling retaliated against him "for exercising his
9   right to redress/appeal a reasonable right to law library access issue" on three separate
10  occasions on April 2, 2014, April 5, 2014, and on April 26, 2014.  (Dkt. No. 18-1 at 3, 5–
11  6.)  Plaintiff further alleges Sterling retaliated against him on October 17, 2014 when he
12  attempted to make copies and obtain a certified trust account statement in order to pursue
13  civil rights litigation in this district.  (*Id.* at 7–8.)  In his opposition brief, Plaintiff again
14  argues that Sterling retaliated against him for "seeking redress of reasonable law library
15  access"; that his conduct, which provided the motive for Sterling's retaliation, was
16  protected under the First Amendment; and that he suffered adverse consequences as a
17  result of Sterling's retaliatory acts.  (Dkt. No. 23 at 22–23.)  It is apparent that Plaintiff
18  does not allege separate claims, but that his allegations are subsumed within his First
19  Amendment retaliation claims.

20      Accordingly, having concluded that Plaintiff does not allege separate free speech
21  and right to redress grievances claims, the Court **DENIES AS MOOT** Defendants'
22  motion to dismiss.[11]

23
24
---
25  [11] The decisions that Defendants cite for the broad proposition that "[t]here is no constitutional right to a
    prison administrative grievance system," (Dkt. No. 22-1 at 23–24), are cases holding that a prison
26  grievance procedure does not create a protected liberty interest cognizable for purposes of a Fourteenth
    Amendment due process claim, *see, e.g.*, *Mann v. Adams*, 855 F.2d 639, 640 (9th Cir. 1988) (holding
27  that "unpublished administrative policy statements of the Arizona Department of Corrections in
    establishing a grievance procedure" did not create a "protected liberty interest").  Those cases stem from
28  a line of authority separate from First Amendment jurisprudence.  Although Plaintiff does not explicitly

## IV.    Supervisory Liability and Deliberate Indifference

Finally, Defendants contend that Plaintiff does not state a "claim for deliberate indifference" or a "claim for supervisory liability" against Defendants Balakian, Seibel, and Paramo.  (Dkt. No. 22-1 at 24–27.)

The Court first observes that rather than asserting separate claims for deliberate indifference and supervisory liability against Defendants Balakian, Seibel, and Paramo,[12] Plaintiff alleges generally that Defendants Balakian, Seibel, and Paramo are liable under a theory of supervisory liability, which Plaintiff terms "deliberate indifference."  (Dkt. No. 18-1 at 2.)  Plaintiff alleges that the three Defendants were liable because they were deliberately indifferent to, and acquiesced in, Sterling's alleged constitutional violations.  (*Id.*)  Plaintiff further alleges that the three Defendants were aware, or should have been aware, of Sterling's actions, which involved prior incidents with other inmate litigants "over a period of time," but failed nonetheless to provide a remedy, training, or supervision.  (*Id.*)

"Under Section 1983, supervisory officials are not liable for actions of subordinates on any theory of vicarious liability."  *Crowley v. Bannister*, 734 F.3d 967, 977 (9th Cir. 2013) (quoting *Hansen v. Black*, 885 F.2d 642, 645–46 (9th Cir. 1989)).  "A

---

assert such a claim, to the extent Plaintiff alleges a due process violation premised upon Defendants' improper response, or failure to respond, to his CDCR Form 22s and CDCR 602 Appeals, the Court agrees that Plaintiff has failed to state a § 1983 claim.  *See, e.g., Arceo v. Salinas*, No. 2:11-CV-2396 KJN P, 2016 WL 1073257, at *3 (E.D. Cal. Mar. 18, 2016), *adopted by* 2016 WL 6897226 (E.D. Cal. Nov. 23, 2016) ("Even if the facility elects to provide a grievance mechanism, alleged violations of the procedures do not give rise to § 1983 claims because inmates do not have a protected liberty interest in jail or prison grievance procedures."); *Herrera v. Hall*, 08-cv-01882-LJO-SKO PC, 2010 WL 2791586, at *4 (E.D. Cal. July 14, 2010), *adopted by* 2010 WL 3430412 (E.D. Cal. Aug. 30, 2010) ("[A p]laintiff has no substantive right to a prison grievance system and . . . due process claims based on the denial of or interference with a prisoner's access to a prison grievance system are not cognizable" under Section 1983.).

[12] In moving to dismiss Plaintiff's "claim for deliberate indifference," Defendants cite solely to cases in which prisoners alleged Eighth Amendment violations.  (Dkt. No. 22-1 at 24.)  Plaintiff does not assert an Eighth Amendment violation or allege a separate "claim for deliberate indifference," but rather uses the phrase "deliberate indifference" to explain his theory of supervisor liability.

supervisor may be liable only if (1) he or she is personally involved in the constitutional deprivation, or (2) there is 'a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation.'" *Id.* (quoting *Hansen*, 885 F.2d at 646); *see also Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011). "For an official to be liable for another actor's depriving a third party of his constitutional rights, that official must have at least the same level of intent as would be required if the official were directly to deprive the third party of his constitutional rights." *Lacey v. Maricopa Cty.*, 693 F.3d 896, 916 (9th Cir. 2012); *accord Quiroz v. Horel*, 85 F. Supp. 3d 1115, 1149 (N.D. Cal. 2015) ("A plaintiff must also show that the supervisor had the requisite state of mind to establish liability, which turns on the requirement of the particular claim— and, more specifically, on the state of mind required by the particular claim—not on a generally applicable concept of supervisory liability." (citing *Oregon State University Student Alliance v. Ray*, 699 F.3d 1053, 1071 (9th Cir. 2012)).

In order to demonstrate a sufficient causal connection, "a plaintiff must show the supervisor breached a duty to plaintiff which was the proximate cause of the injury." *Starr*, 652 F.3d at 1207 (quoting *Redman v. Cnty. Of San Diego*, 942 F.2d 1435, 1447 (9th Cir. 1991)). "'The requisite causal connection can be established . . . by setting in motion a series of acts by others' . . . or by 'knowingly refus[ing] to terminate a series of acts by others, which [the supervisor] knew or reasonably should have known would cause others to inflict a constitutional injury.'" *Id.* at 1207–08 (internal citations omitted, alteration in original).

In addition, "[a] supervisor can be liable in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates; for his acquiescence in the constitutional deprivation; or for conduct that showed a reckless or callous indifference to the rights of others." *Watkins v. City of Oakland*, 145 F.3d 1087, 1093 (9th Cir. 1998) (internal alteration and quotation marks omitted).

/ / / /

/ / / /

### A. Defendant Balakian

Plaintiff alleges in Count 1 that after Sterling refused to accept his CDCR Form 22 on April 2, 2014, he forwarded the request to Balakian, who, Plaintiff believes, instructed Sterling to respond.  (*Id.* at 3.)  Sterling responded on April 15, 2014.  (*Id.* at 15.) Plaintiff further alleges that, dissatisfied with Sterling's response, he resubmitted the request for supervisor review, but received no response from Balakian.  (*Id.* at 3, 15.) However, according to the attached CDCR Form 22, Plaintiff forwarded the request for supervisor review prior to receiving a response from Defendant Sterling.  (*Id.* at 15.)  In addition, Plaintiff alleges he submitted his April 5, 2014 CDCR Form 22 to Balakian for supervisor review on April 6, 2014, but received no response.  (*Id.* at 4, 22.)  Plaintiff alleges Sterling retaliated against him (1) on April 2, 2014 by instructing a trainee to issue a CDCR 128A Chrono Report alleging misconduct by Plaintiff, (*id.* at 17), and (2) on April 5, 2014 by falsely charging him with a CDCR 115 RVR for "Disobeying a Direct Order," dated April 11, 2014, (*id.* at 3–4, 24).

The Magistrate Judge concluded, and this Court agrees, that the foregoing allegations, even liberally construed, do not plausibly suggest that Balakian was personally involved in the alleged First Amendment retaliation, or that there was a sufficient causal connection between Balakian's conduct and Sterling's retaliatory acts. First, it appears that Plaintiff submitted his Form 22 to Balakian for review on April 2, 2014, prior to Sterling's response on April 15, 2014.  (*Id.* at 15.)  Plaintiff's first Form 22 thus may not have been ripe for Balakian to review.  Even assuming that the Form 22 was properly before Balakian, Plaintiff's allegation that Balakian instructed Sterling to respond to Plaintiff's allegation that he was erroneously denied PLU status does not suggest in any way that Balakian had the requisite intent to deprive Plaintiff of a constitutional right, or that there was a sufficient causal connection between Balakian's conduct and Sterling's subsequent retaliatory acts.  To the contrary, it indicates that Balakian properly directed Sterling to address Plaintiff's concern.

1      Next, Plaintiff's second Form 22, submitted for Balakian's review on April 6,

2   2014, detailed Plaintiff's ongoing problems securing PLU status with Sterling, and

3   additionally noted that Sterling "became belligerent, refused to grant status, nor adhere to

4   established rules or exception, and falsely accused [him] of threats, manipulation, etc.,

5   when [he] tried to defend, explain, then [n]oticed that [he] would appeal to her

6   supervisors." (*Id.* at 22.)  The incidents detailed in the Form 22 involve a verbal

7   altercation between Sterling and Plaintiff, stemming from Plaintiff's disagreement with

8   Sterling's denial of his PLU status request.  Nowhere in the second Form 22 does

9   Plaintiff alert Balakian of retaliatory conduct by Sterling, (*id.*), despite the fact that the

10  allegedly retaliatory Chrono Report was issued four days earlier on April 2, 2014, (*id.* at

11  3–4, 17).  Balakian's alleged failure to respond to Plaintiff's second Form 22 also does

12  not plausibly show that Balakian was personally involved in the issuance of the false

13  RVR, or that there was a sufficient causal connection between Balakian's conduct and

14  Sterling's issuance of the false RVR.  Nor has Plaintiff pled that Balakian knew of any

15  retaliatory conduct by Sterling and acquiesced thereto.[13]

16      Accordingly, the Court **GRANTS** Defendants' motion to dismiss Plaintiff's

17  Counts 1, 2, and 3 against Balakian.

18      **B. Defendant Seibel**

19      Plaintiff alleges in Count 2 that Seibel denied Plaintiff's CDCR 602 Appeal (Log

20  No. RJD 14-1835), dated May 13, 2014, at the second level of review on June 14, 2014,

21  thereby "sid[ing] with Sterling." (Dkt. No. 18-1 at 6, 48–53.)  In his CDCR 602 Appeal,

22  Plaintiff alleged "an ongoing and serious problem" with Sterling's "reprisal and

23

24  _____

25  [13] Plaintiff states in his opposition brief that Balakian "failed to act on" other instances of similar
    conduct by Sterling "that occurred prior to the facts contained in [the] SAC," and that this failure to act

26  "amounts to deliberate indifference and supervisor liability, where, and d[e]spite numerous grievances,
    by numerous inmates, all concerning K. Sterling, no remedy was provided." (Dkt. No. 23 at 16–17.)

27  However, Plaintiff has not pled in his SAC allegations of an ongoing failure to act by Balakian, or
    allegations that Balakian had notice of prior instances of First Amendment retaliation by Sterling.  As

28  such, the Court will not consider Plaintiff's argument on the basis that it is extrinsic to his pleadings.

retaliatory" course of conduct in response to Plaintiff "exercising the protected right of 'Access to Court,'" and alleged that Sterling's "retaliatory acts [were] designed to determine [him] a program failure." (*Id.* at 48.) Sterling further chronicled incidents with Sterling that had occurred on April 2, 5, 16, and 26 of 2014, including allegations that Sterling "manufactured" two RVRs against Plaintiff within a "short period" of time, thereby exposing Plaintiff to the "possibility of job loss," classification as a "program failure," and C-Status. (*Id.* at 50.)

Plaintiff's appeal was reviewed and determined not to meet the requirements for assignment as a staff complaint and was instead referred for routine appeal processing. (*Id.* at 52–53.) Seibel did not address the retaliation allegations in her Memorandum. (*Id.*) Plaintiff contends that his appeal was "intentional[ly] misclassify[ed]," and that Seibel "failed to supervise, train, or remedy [the] underlying issue, due to [the] misclassification." (*Id.* at 6.) Plaintiff asserts that "but for" the misclassification and Seibel's "failure to provide remedy," there would have been no subsequent retaliation by Sterling. (*Id.*) Plaintiff further alleges that Seibel's decision regarding the PLU request evidences "deliberate indifference." (*Id.*)

In Count 3, Plaintiff alleges that Seibel was "[i]n attendance" at the October 23, 2014 ICC review, whereupon Plaintiff was released from Ad-Seg, assigned to a different facility pending adverse transfer, and had his privileges reduced. (*Id.* at 7–8, 70–74.) Plaintiff alleges that during the ICC review, he addressed Seibel "when given permission," and explained the situation. (*Id.* at 8.) He informed her that "but for the unreasonable misclassification of CDCR 602 Appeal/Grievance, resulting in unfavorable outcome and no remedy, that this current incident could have been prevented, and Plaintiff's right to access to court, would not have been infringed upon." (*Id.*) He alleges that Defendant Seibel's failure to respond allowed Captain Stout to assign Plaintiff to a different facility pending adverse transfer and to reduce his privileges. (*Id.*)

The Magistrate Judge concluded that these allegations do not allege supervisory liability against Seibel. (Dkt. No. 29 at 29.) Judge Porter's conclusion primarily rested

29

upon the five-month period that elapsed between the time Seibel received notice of Sterling's ongoing retaliatory conduct and the time Sterling's subsequent retaliatory act occurred:

> Although Plaintiff's May 13, 2014 CDCR 602 Appeal apprised Defendant Seibel of ongoing retaliatory conduct by Defendant Sterling in April 2014, Plaintiff's only subsequent allegation of retaliation occurred in October 2014. Thus, over five months passed between Defendant Seibel being on notice of retaliatory conduct and the next alleged incident occurring. Although a sufficient causal connection may be established where a supervisor knowingly refuses to terminate a series of unconstitutional acts by others, the Court finds the SAC does not sufficiently allege that Defendant Seibel knew the alleged unconstitutional acts were ongoing in October 2014.

(*Id.*)

This Court agrees that Plaintiff's May 13, 2014 CDCR 602 Appeal apprised Seibel of ongoing retaliatory conduct by Sterling—specifically, Sterling's issuance of false RVRs in retaliation against Plaintiff for engaging in protected conduct. Plaintiff has not alleged that Seibel had the requisite "same level of intent as would be required if [Seibel] were directly to deprive [Plaintiff] of his constitutional rights." *Lacey*, 693 F.3d at 916. Plaintiff thus has not sufficiently alleged that Seibel can be held liable for the constitutional torts committed by her subordinate. *See id.*

However, this Court reaches a different conclusion regarding Seibel's liability in her *individual* capacity. As Defendants acknowledge, (*see* Dkt. No. 22-1 at 25), "[s]upervisors can be held liable for: 1) their own culpable action or inaction in the training, supervision, or control of subordinates; 2) their acquiescence in the constitutional deprivation of which a complaint is made; or 3) for conduct that showed a reckless or callous indifference to the rights of others," *Cunningham v. Gates*, 229 F.3d 1271, 1292 (9th Cir. 2000), *as amended* (Oct. 31, 2000). Here, where Plaintiff notified Seibel in no uncertain terms (allegations that mirror those appearing in the instant SAC) about specific, ongoing instances of retaliatory conduct by Sterling in April 2014,

Plaintiff has plausibly alleged, at minimum, that Seibel failed to supervise or control Sterling despite notice of Sterling's retaliatory conduct.

Accordingly, this Court **DENIES** Defendants' motion to dismiss Plaintiff's Counts 2 and 3 against Seibel.  However, this Court **GRANTS** Defendants' motion to dismiss Plaintiff's Count 1 against Seibel, as Plaintiff has not shown that Seibel had notice of Sterling's retaliatory conduct prior to the retaliatory incidents alleged in Count 1.

### C. Defendant Paramo

Plaintiff attached to his SAC three letters addressed to Paramo, among other recipients, from an inmate at RJD who assists other inmates proceeding *pro se* in legal proceedings.[14]  (Dkt. No. 18-1 at 78–93.)  The first letter, dated August 28, 2013, concerns Sterling's failure to maintain regular library hours, which hampers inmate access to the law library.  (*Id.* at 78–80.)  The second letter, dated August 29, 2013, raises the issue of Sterling's ongoing conduct, including her lack of professionalism, "disparaging and rude interaction[s] with inmates," improper and erroneous legal advice to inmates, "impermissible reading of inmate legal documents," and lack of understanding of appropriate filing procedures.  (*Id.* at 81–87.)  The second letter further states that "[o]ver a hundred prisoners on the Facility grounds have been readily vocal to the unsavory interactions between them and STERLING, and daily," and that Sterling's conduct "has reached the constitutional dimension of state actor interference with the prisoners' access to the Courts."  (*Id.* at 85–86.)  The letter concludes by informing Paramo that "the above matters are now being prepared for an actual briefing of a federal court filing in a civil complaint and will name STERLING as the entirely single

---

[14] In addition to the three letters, Plaintiff attached to his SAC a CDCR 22 Form from another inmate, dated January 3, 2015, complaining of Sterling improperly reading his court documents, refusing to show him his copies, and making a copy of his complaint in its entirety.  (*Id.* at 76.)  As Defendants note, this Form 22 pre-dated Sterling's retaliatory acts against Plaintiff.  Plaintiff also provides a list of orders in two cases filed in the Southern District, both of which involved Sterling, but arose prior to Paramo's tenure: *Wiseman v. Hernandez*, No. 3:08-cv-01272-LAB-NLS, and *Gray v. Hernandez*, 3:08-cv-01147-JM-WVG.  (*Id.* at 8–9.)

1    defendant[], in her official and personal capacity." (*Id.* at 86.)  The third letter, dated

2    October 4, 2013, contends Sterling reads inmates' confidential legal documents and

3    details incidents wherein Sterling singled out for harassment inmates who make frequent

4    use of the law library.  (*Id.* at 88–90.)  The letter states that "practically any interaction"

5    between Sterling and inmates is full of "inconsiderate disregard, abundant sarcasm, and

6    just rife with an obvious objective to find fault and suspect in everyone.  There is no

7    question that STERLING has a deep seated hatred against inmates who frequently use the

8    library[.]"  (*Id.* at 89.)  The letter further states that Defendant Sterling "just won't let it

9    go," and will "lay and wait for any opportunity to write up any inmate for her construed

10   of view any conduct at all . . . with her presentation of claims consistent yet whimsically

11   changing as the evidence unfolds."  (*Id.* at 90.)  The letter indicates a lawsuit will be filed

12   against Sterling and alleging that she has "violated the plaintiff's right to access the

13   Court" and failed to maintain a library "free of harassment and retaliation."  (*Id.* at 91.)

14   The writer also specifically mentions that he plans to cite Sterling's "six or more overt

15   acts meant as retaliation against [him], on the basis that [he had] reported her for her bad

16   or unorthodox conduct."  (*Id.*)

17          As was the case for Seibel, Plaintiff has not alleged that Paramo had the requisite

18   "same level of intent as would be required if [Paramo] were directly to deprive [Plaintiff]

19   of his constitutional rights."  *Lacey*, 693 F.3d at 916.  Plaintiff thus has not sufficiently

20   alleged that Paramo can be held liable for the constitutional torts committed by his

21   subordinate.  *See id.*  However, Plaintiff has sufficiently alleged that Paramo may be

22   liable in his individual capacity.  The Magistrate Judge concluded, and this Court agrees,

23   that Plaintiff's SAC contains specific factual allegations demonstrating that Paramo was

24   put on notice of Sterling's conduct prior to her alleged retaliation against Sterling, and

25   failed to act, thereby plausibly suggesting that Paramo acquiesced in the alleged

26   unconstitutional conduct.  *See Starr*, 652 F.3d at 1209–11 (finding allegations of specific

27   incidents in letters and reports sufficient to put a supervisor on notice of a problem, and

28   concluding that the supervisor's failure to act plausibly suggests that he acquiesced in the

unconstitutional conduct of his subordinates).  Although Defendants argue that the three letters are all authored by the same inmate, (Dkt. No. 22-1 at 27), Defendants do not otherwise contend how the three letters did not put Paramo on notice of Sterling's ongoing conduct.

Paramo received at least three letters containing allegations that Sterling singled out frequent users of the law library, gave inaccurate advice regarding the law and filing procedures, improperly read confidential legal documents, and would "wait for any opportunity to write up any inmate for her construed of view any conduct at all." (Dkt. No. 18-1 at 90.)  Moreover, the letters specifically contended that Sterling "interfere[d] with the prisoners' access to the Courts," (*id.* at 85–86), failed to maintain a library "free of harassment and retaliation," (*id.* at 91), and committed "six or more overt acts" of retaliation against the letter's author after he asserted grievances against her, (*id.*). Construing Plaintiff's allegations in the light most favorable to him, Plaintiff has plausibly alleged that Paramo, at minimum, failed to supervise or control Sterling despite notice of Sterling's retaliatory conduct.

Accordingly, because Paramo had notice of Sterling's retaliatory conduct prior to April and October of 2014, this Court **DENIES** Defendants' motion to dismiss Plaintiff's Counts 1, 2, and 3 against Paramo.

**CONCLUSION**

For the foregoing reasons, the Court **ADOPTS IN PART** Judge Porter's Report and Recommendation and **GRANTS IN PART** and **DENIES IN PART** Defendants' Motion to Dismiss Portions of Plaintiff's SAC.  Specifically, the Court **DISMISSES** Plaintiff's Counts 1, 2, and 3 against Defendant Balakian, and **DISMISSES** Plaintiff's Count 1 against Defendant Seibel.  The remainder of Defendants' motion to dismiss is **DENIED**.

If he so chooses, Plaintiff may amend his Counts 1, 2, and 3 against Defendant Balakian, and his Count 1 against Defendant Seibel, in a Third Amended Complaint on or before **April 21, 2016**.  Plaintiff is reminded that if he elects to file a Third Amended

Complaint, it must be complete by itself without reference to prior pleadings.  *See* S.D. Cal. Civ. LR 15.1; *Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.*, 896 F.2d 1542, 1546 (9th Cir. 1989) ("[A]n amended pleading supersedes the original."); *Lacey*, 693 F.3d at 928 (noting that claims dismissed with leave to amend which are not re-alleged in an amended pleading may be "considered waived if not repled.").

**IT IS SO ORDERED.**

Dated:  March 15, 2017

Hon. Gonzalo P. Curiel
United States District Judge